**Javier SANCHEZ–ESPINOZA, et al., Plaintiffs,**

**v.**

**Ronald Wilson REAGAN, et al., Defendants.**

**Civ. No. 82–3395.**

United States District Court, District of Columbia.

Aug. 1, 1983.

Ellen Yaroshefsky, Sarah Wunsch, Margaret L. Ratner, Peter Weiss, Michael Ratner, Mark Van Der Hout, National Lawyers Guild, Center for Constitutional Rights, New York City, William H. Schaap, Center for Constitutional Rights, Washington, D.C., for plaintiffs.

Richard Greenberg, Vincent M. Garvey, David J. Anderson, Dept. of Justice, Washington, D.C., for defendants.

## MEMORANDUM AND ORDER

CORCORAN, District Judge.

Before the Court is the motion of the federal defendants, pursuant to Rule 12 of the Federal Rules of Civil Procedure, to dismiss this action in its entirety, or, in the alternative, to dismiss it as against the federal defendants. As grounds therefor they assert, *inter alia,* that (1) subject matter jurisdiction is lacking due to the presence of a political question, (2) plaintiffs do not have standing, (3) plaintiffs have failed to state a cause of action under any of the theories alleged in the complaint, (4) personal jurisdiction is lacking over several of the federal defendants, (5) venue is improper in the District of Columbia, and (6) the federal defendants enjoy absolute immunity from suits of this type. Plaintiffs have opposed. There has been extensive briefing of all the issues presented.

Because we find that (1) this case involves significant factual and policy questions for which there are no judicially discoverable and manageable standards, and

(2) resolution of plaintiff's claims would seriously impinge on the powers of the Legislative and Executive branches to establish and carry out foreign policy, as well as provide for national security, we conclude that this lawsuit is not justiciable. As a result, defendants' motion to dismiss this case in its entirety will be granted.

## I. BACKGROUND

As presently drafted,[1] the complaint lists twenty-six plaintiffs, to wit, (1) twelve nonresident aliens, citizens of Nicaragua, (2) twelve members of the United States House of Representatives, and (3) two residents of the state of Florida who sue on behalf of that state. The named defendants can similarly be broken down into three groups, namely (1) nine present or former officials of the Executive Branch, including President Ronald Reagan,[2] (2) three non-federal defendants (one individual and two unincorporated associations located in Florida), and (3) an unspecified number of, as yet, unidentified officers or agents employed by the United States.

The complaint is styled in eight causes of action which, for our purposes, can be grouped together into three broad categories of claims for relief. First, the Nicaraguan plaintiffs seek damages for injuries allegedly caused by U.S.-sponsored terrorist raids against various towns and villages in Nicaragua. They allege that paramilitary activities have been, and continue to be, financed and carried out by the U.S. government, its agents and employees, against the people of Nicaragua, in an attempt to overthrow their national government. Plaintiffs maintain that the U.S.-sponsored raids violate fundamental human rights established under international law and the U.S. Constitution. These plaintiffs

also seek an injunction prohibiting further U.S. military involvement in Nicaragua.

The Congressional plaintiffs present a second category of claims. They allege that the activities described above constitute acts of war which have not been authorized by Congress. These plaintiffs claim violations of their authority to declare war under Article I, § 8, cl. 11, of the Constitution, and laws promulgated thereunder, such as the so-called "neutrality laws," 18 U.S.C. §§ 956 *et seq.,* and the War Powers Resolution, 50 U.S.C. §§ 1541–48. In short, they sue to stop an alleged undeclared war waged by the federal defendants against the people and government of Nicaragua. The Congressional plaintiffs also allege a violation of the Boland Amendment to the 1983 Department of Defense Appropriations Act, P.L. 97–377, § 793 (1982), which prohibits the Central Intelligence Agency ("CIA") and the Department of Defense from using any of the funds provided in the Act for military activities aimed at overthrowing the government of Nicaragua. The Congressmen seek declaratory and injunctive relief.

Finally, the Florida plaintiffs seek to enjoin the alleged operation of U.S.-sponsored paramilitary training camps located in Florida, inasmuch as they constitute a nuisance under Florida law. Plaintiffs Eleanor Ginsberg and Larry O'Toole, residents of Dade County, Florida, sue on behalf of the state of Florida, to close those camps.

■ Plaintiffs rely on 28 U.S.C. §§ 1331 (federal question), 1350 (alien tort claims), 1361 (mandamus), 2201 and 2202 (declaratory judgments), and the doctrine of pendent jurisdiction, *see United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), as grounds for establish-

---

1. The original complaint was filed on November 30, 1982. On June 8, 1983, we dismissed the action as to several of the non-federal defendants due to plaintiffs' failure to timely serve them with process. *See* Fed.R.Civ.P. 4(j). Thereafter, on July 20, 1983, plaintiffs filed the amended complaint that is under consideration here. The new complaint deleted the defendants we had already dismissed, added eleven Congressional plaintiffs, and alleged a statutory

grounds for relief which had previously been addressed by the parties in their briefs on the instant motion to dismiss.

2. The federal defendants include Ronald Wilson Reagan, William Casey, Alexander M. Haig, Jr., George P. Shultz, Thomas O. Enders, Vernon Walters, Caspar Weinberger, Nestor Sanchez, and John D. Negroponte.

ing subject matter jurisdiction in this Court.[3]

## II. DISCUSSION

This lawsuit is another cog in the wheel of controversy currently surrounding U.S. government involvement in Central America, particularly in Nicaragua, Honduras and El Salvador. The federal defendants strenuously argue that adjudication of plaintiffs' claims would impermissibly interfere with the constitutional powers of the Executive and Legislative branches of our government to conduct foreign affairs and attend to national security concerns. As a result, they argue, this case presents a non-justiciable political question. We agree.

■ The political question doctrine insures that the judiciary exhibits appropriate concern for the separation of powers under our tri-partite system of government. *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 165–66, 2 L.Ed. 60 (1803); *Baker v. Carr,* 369 U.S. 186, 210, 82 S.Ct. 691, 706, 7 L.Ed.2d 663 (1962); *Laird v. Tatum,* 408 U.S. 1, 15, 92 S.Ct. 2318, 2326, 33 L.Ed.2d 154 (1972); *see INS v. Chadha* —— U.S. ——, —— – ——, 103 S.Ct. 2764, 2779, 77 L.Ed.2d 317 (1983). To determine whether the resolution of a matter violates separation of powers principles, thereby making it a non-justiciable political question, we must apply the factors outlined by the Supreme Court in *Baker:*

> Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the re-

spect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

369 U.S. at 217, 82 S.Ct. at 710; *see Consumer Energy, Etc. v. F.E.R.C.,* 673 F.2d 425, 452 (D.C.Cir.1982), aff'd, —— U.S. ——, 103 S.Ct. 3556, 77 L.Ed.2d 1402, 1403, 1413 (1983).

■ In the present context, we are mindful that "[m]atters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention," *Haig v. Agee,* 453 U.S. 280, 292, 101 S.Ct. 2766, 2774, 69 L.Ed.2d 640 (1981), inasmuch as they are "so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." *Harisiades v. Shaughnessy,* 342 U.S. 580, 589, 72 S.Ct. 512, 519, 96 L.Ed. 586 (1952), quoted in *Agee,* 453 U.S. at 292, 101 S.Ct. at 2774. That is not to say, however, that every exercise of foreign policy power is unreviewable. *See, e.g., Youngstown Sheet & Tube Co. v. Sawyers,* 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (President Truman had no authority to seize the nation's steel mills in the face of a nationwide strike, even though he asserted the exigencies of the Korean Conflict); *Dames & Moore v. Regan,* 453 U.S. 654, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981) (President Carter had authority under certain statutes to "suspend" individual damage claims against Iran as part of bargain to secure release of U.S. hostages). Rather, a court must take special care, when confronted with a challenge to the validity of U.S. foreign policy initiatives, to give appropriate deference to the decisions of the political branches, who are constitutionally empowered to conduct foreign relations and provide for national security.

---

**3.** We note at the outset, however, that 28 U.S.C. §§ 2201, 2202 do not create an independent basis of subject matter jurisdiction, but merely provide a particular remedy where a federal district court already has jurisdiction to

entertain a suit. *Smith v. Lehman,* 533 F.Supp. 1015, 1018 (E.D.N.Y.1982); *First Nat. Bank of Scotia v. U.S.,* 530 F.Supp. 162, 168 n. 5 (D.D.C. 1982).

With these principles in mind, we proceed to analyze the instant lawsuit.

## A. Claims of the Congressional Plaintiffs

■ As previously noted, twelve members of Congress sue for declaratory and injunctive relief alleging that the President, through his officers and appointees, has violated the neutrality laws, the War Powers Resolution, the National Security Act of 1947 (50 U.S.C. §§ 401 et seq.), especially the Hughes-Ryan Amendment (50 U.S.C. § 413, which requires certain reports to be made to Congress about U.S. intelligence activities), and the Boland Amendment, by carrying on an undeclared war against the Nicaraguan government. They argue that judicial relief is necessary because the President has ignored significant statutory restrictions on his power to engage in hostilities directed against foreign nations. In other words, the Congressional plaintiffs maintain that the judiciary must act to control Executive abuses of power in this case because Congress has done all·it can, namely, pass legislation. For several reasons, we decline plaintiffs' invitation to delineate Presidential foreign policy power regarding Central America.

First, this Court lacks judicially discoverable and manageable standards for resolving the dispute presented. See Baker, 369 U.S. at 217, 82 S.Ct. at 710; Crockett v. Reagan, 558 F.Supp. 893, 898 (D.D.C.1982), appeal docketed, No. 82–2461 (D.C.Cir.1982) (action by Congressmen to enjoin provision of military aid to El Salvador declared nonjusticiable due to lack of discoverable standards to determine whether or not U.S. military personnel were engaged in hostilities). In Crockett, as here, the questions presented require judicial inquiry into sensitive military matters. Moreover, the covert activities of CIA operatives in Nicaragua and Honduras are perforce even less judicially discoverable than the level of participation by U.S. military personnel in hostilities in El Salvador. See Halkin v. Helms, 690 F.2d 977 (D.C.Cir.1982).

A second reason for finding this matter non-justiciable is the impossibility of our undertaking independent resolution without expressing a lack of the respect due coordinate branches of government. President Reagan has stated on numerous occasions, to the Congress and to the public at large, that he is not violating the spirit or letter of the Boland Amendment, or any other statutes, in Nicaragua. By all media accounts, members of both Houses of Congress strenuously disagree with the President's assertion. Were this Court to decide, on a necessarily incomplete evidentiary record, that President Reagan either is mistaken, or is shielding the truth, one or both of the coordinate branches would be justifiably offended. At this stage, therefore, it is up to Congress and the President to try to resolve their differences and jointly set a course for U.S. involvement in Central America.

Finally, there is a real danger of embarrassment from multifarious pronouncements by various departments on one question. As previously noted, the Executive urges that his actions are legal and necessary to national security. Congress, especially the House of Representatives,[4] is currently considering the validity of the President's position. Congressional debate is ongoing, and the result will be some legislative pronouncement as to the proper role, if any, of U.S. military and CIA officials in Nicaragua. Judicial resolution of the Congressional plaintiffs' claims unnecessarily might provide yet a third view on U.S. activities in Central America. Such an occurrence would, undoubtedly, rattle the delicate diplomatic balance that is required in the foreign affairs arena. See Holtzman v. Schlesinger, 484 F.2d 1307, 1312 (2d Cir. 1973), cert. denied, 416 U.S. 936, 94 S.Ct. 1935, 40 L.Ed.2d 286 (1974).

■ It is, therefore, prudent for us to decline to adjudicate plaintiffs' claims at this time.[5]

---

4. We take judicial notice that on July 28, 1983, the U.S. House of Representatives voted to end funding for covert activities in Nicaragua. Washington Post, July 29, 1983, at 1, col. 6.

5. A second, but not altogether independent, ground for withholding judicial action is the doctrine of equitable or remedial discretion. Riegle v. Federal Open Market Committee, 656

## B. *Claims of the Nicaraguan Plaintiffs*

The twelve non-resident alien plaintiffs, citizens and residents of Nicaragua, cast their claims for relief in the form of a combined international law and constitutional tort action. Much of the complaint is devoted to detailed descriptions of the atrocities allegedly committed against plaintiffs by U.S.-sponsored terrorist forces in Nicaragua. Plaintiffs assert that their rights to monetary and equitable relief arise under the Fourth and Fifth Amendments to the Constitution, as well as numerous treaties, United Nations Resolutions, and declarations of international human rights.[6]

Notwithstanding the gravity and legal complexity of plaintiffs' claims, we find that, for the same reasons expressed in the previous section, those claims are not justiciable.

In order to adjudicate the tort claims of the Nicaraguan plaintiffs, we would have to determine the precise nature and extent of the U.S. government's involvement in the affairs of several Central American nations, namely, Honduras, Costa Rica, El Salvador, and Nicaragua. *See* Complaint at ¶¶ 40, 42, 46, 48–53, 73, 76. As pointed out above, judicial resolution of this matter is not proper at this time because it involves a nonjusticiable political question. *See also Eminente v. Johnson,* 361 F.2d 73 (D.C.Cir.),

F.2d 873 (D.C.Cir.1981); *Vander Jagt v. O'Neill,* 699 F.2d 1166 (D.C.Cir.1983); *Crockett,* 558 F.Supp. 893. This principle was fashioned by the Court of Appeals in *Riegle*:

> The most satisfactory means of translating our separation-of-powers concerns into principled decision-making is through a doctrine of circumscribed equitable discretion. Where a congressional plaintiff could obtain substantial relief from his fellow legislators through the enactment, repeal, or amendment of a statute, this court should exercise its equitable discretion to dismiss the legislator's claim.

656 F.2d at 881, quoted in *Vander Jagt,* 699 F.2d at 1174 n. 23. Here, as in *Riegle,* while the claims of the Congressional plaintiffs are framed as a dispute with the Executive, plaintiffs' primary avenue of relief is through the "enactment, repeal or amendment of a statute," e.g., one cutting off funds for covert action in Nicaragua, *see* note 4, *supra.* Thus, we are presented, "not with a chance to mediate between two political branches, but rather with the possibility of thwarting Congress's will by allowing ... plaintiff[s] to circumvent the process of democratic decisionmaking." *Riegle,* 656 F.2d at 881. On this basis alone we would be constrained to refuse judicial action on the claims of the Congressional plaintiffs.

**6.** Specifically, plaintiffs list the following as jointly and severally providing them with a viable action in this Court:

American Declaration of the Rights and Duties of Man, Resolution XXX, Ninth International Conference of American States, *reprinted in* Inter-American Commission on Human Rights, Handbook of Existing Duties Pertaining to Human Rights, OEA/Ser. L/V/II.50, Doc. 6 at 17 (1980);

Charter of the Organization of American States, 2 U.S.T., 2394, *as amended,* 21 U.S.T. 607;

Charter of the United Nations, 59 Stat. 1021, 3 Bevans 1153;

Declaration of Principles of International Law Concerning Friendly Relations and Cooperation in Accordance with the Charter of the United Nations, G.A.Res. 2625, 25 U.N. GAOR, Supp. (No. 28), U.N.Doc. A/8028 at 121 (1970);

Declaration on the Protection of all Persons From Being Subjected to Torture and Other Cruel, Inhuman or Degrading Punishment, G.A. Res. 3452, 30 U.N. GAOR, Supp. (No. 34) U.N.Doc. A/10034 at 91 (1975);

Geneva Convention Relative to the Protection of Civilian Persons in Time of War, 6 U.S.T. 3516;

Inter-American Treaty of Reciprocal Assistance, 62 Stat. 1681, 4 Bevans 559;

Treaty of Friendship, Commerce & Navigation between the United States and Nicaragua, 9 U.S.T. 449;

United Nations General Assembly Resolution 95(I), G.A. Res. 191, U.N.Doc. A/64/Add.1 at 188 (1964);

Universal Declaration of Human Rights, U.N. Res. 217A, U.N.Doc. A/1810 at 71 (1948). Because we dismiss this lawsuit as non-justiciable, we do not decide whether any or all of those sources of international law create a legal foundation for the relief requested by plaintiffs. *Compare Filartiga v. Pena-Irala,* 630 F.2d 876 (2d Cir.1980) (torture is a violation of the law of nations that gives rise to an action for damages in federal court), with *Hanoch Tel-Oren v. Libyan Arab Republic,* 517 F.Supp. 542 (D.D.C. 1981) (law of nations or treaties must provide for private right of action in order for an injured plaintiff to obtain relief in federal court under alien tort statute, 28 U.S.C. § 1350).

*cert. denied,* 385 U.S. 929, 87 S.Ct. 287, 17 L.Ed.2d 211 (1966) (non-resident alien's damage claims against President Johnson due to destruction of property in Vietnam as a result of American military actions in Southeast Asia, dismissed as a non-justiciable controversy).[7] This Court simply does not have the resources and expertise required to oversee U.S. military affairs in Central America.

### C. Claims of the Florida Plaintiffs

██ Two residents of Dade County, Florida sue in the name of the state to abate a nuisance allegedly caused by the operation of paramilitary training camps in their county of residence. Their claims arise under Florida law and do not have an independent basis of federal subject matter jurisdiction. Rather, plaintiffs rely on the doctrine of pendent jurisdiction as enunciated in *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Since we dismiss the federal causes of action, the state law claims of the Florida plaintiffs have no federal jurisdictional hook. Thus, this action must be dismissed in its entirety as against all defendants.

### III. CONCLUSION

The instant action is replete with insurmountable obstacles to justiciability; not the least of which is the current debate and consideration of the issues presented here by both the Executive and Congress. We, therefore, must refrain from affording plaintiffs a day in court in view of our constitutional duty to respect the separation of powers.

Accordingly, it is, this 1st day of August, 1983

ORDERED that defendants' motion to dismiss be, and the same hereby is, GRANTED; and it is

FURTHER ORDERED that this action be, and the same hereby is, DISMISSED in its entirety as against all defendants.

---

**7.** Moreover, we have serious doubts that non-resident aliens can invoke the protection of the U.S. Constitution. *See Johnson v. Eisenstrager,* 339 U.S. 763, 771, 70 S.Ct. 936, 940, 94 L.Ed. 1255 (1950) ("[I]n extending constitutional protections beyond the citizenry, the Court has been at pains to point out that it was the alien's presence within its territorial jurisdiction that gave the judiciary power to act."); *Pauling v. McElroy,* 278 F.2d 252, 254 n. 3 (D.C.Cir.1960) ("[N]on-resident aliens ... plainly cannot appeal to the protection of the Constitution or laws of the United States."); *cf. Mathews v. Diaz,* 426 U.S. 67, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976) (resident aliens enjoy certain Constitutional guarantees). We believe the more appropriate avenues of relief for plaintiffs are through those international tribunals created in the treaties, resolutions and declarations listed at note 6, *supra.*